# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00623-CV

**Parker Barber & Beauty Supply, Inc., Appellant**

**v.**

**The Wella Corporation, Donald German and Stephen Crawford, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT NO. GN200002, HONORABLE PATRICK O. KEEL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Parker Barber & Beauty Supply, Inc. ("Parker"), an Austin-based beauty supply company, served as the exclusive distributor of Wella hair-care products in Central Texas for nearly twenty years. Upon Wella's termination of its distributorship agreement, Parker sued appellees, The Wella Corporation and two of its corporate officers, Donald German and Stephen Crawford (collectively, "Wella"), alleging, in essence, that Wella had stolen and misused Parker's confidential trade secrets. The trial court granted summary judgment in Wella's favor, and Parker's appeal followed. Parker claims that the summary judgment order was not a final order or, if final, it awarded more relief than Wella was entitled to receive. Further, Parker asserts that the trial court erred in refusing to grant Parker an extension of time to respond to Wella's summary judgment motion and in granting summary judgment because Parker produced evidence raising a genuine issue of material fact on each of its claims. We will affirm.

BACKGROUND

**Parker and Wella's Business Relationship**

The Parker Barber & Beauty Supply company was opened in the 1940s by the Parker family in Austin, Texas.[1]  Around 1954, Parker began selling the Wella Classic line of hair-care products, which were consumer rather than professional grade.  Approximately thirty years later, around 1984, Parker became the exclusive Central Texas distributor of the Wella International line, which was solely available to professional salons and stylists.  Parker claims that it invested significant time and money building Wella's reputation by changing the beauty industry's perception of Wella from a "drugstore" to a "professional" image.

In the spring of 1996, Parker and Wella executed a Distribution Agreement to formalize the terms of their relationship.  The Agreement designated Parker as Wella's exclusive distributor for 65 counties in Central Texas and, as such, obligated Parker "to use substantial efforts to promote, educate with respect to, and distribute Wella Products to professional customers."  Wella, in turn, was bound to provide "technical assistance and training," "attend sales meetings on a reasonable regularly scheduled basis," "participate in . . . clinics and shows," and "supply at no charge to Distributor reasonable quantities of sales and educational materials."  The Agreement also provided that "Wella, in its sole discretion, shall make available additional incentives to assist Distributor in promoting sales of Wella Products."  The Agreement had an effective date of April

---

[1]  The business continues to be run by members of the Parker family.  Brant Parker is the President, his wife Kristen is the Vice-President of Sales, his father Riley is the CEO, and his mother Carol is the Senior Vice President.  Throughout this opinion we will refer to the business as "Parker," and to the family officers by either their first or their full names.

1, 1996, and was to automatically renew each year "unless earlier terminated or not renewed." The Agreement also contained a forum selection clause stating that any dispute arising under or related to the Agreement shall be filed and adjudicated in Virginia.

It is undisputed that, over the course of their relationship, Parker was dedicated to increasing sales of Wella products. Wella recognized Parker's efforts, bestowing various accolades on Parker—including naming Parker as the "distributor of the year" in 1998. Also, statistical charts produced by Wella show that Parker tripled its sales of Wella products from 1997 to 1999 and that, by 2000, Parker was selling Wella products to over 1,400 customers, which accounted for 66% of Parker's potential market. According to Parker, although it also sold other brands' products, the Wella sales comprised the majority of its business.

As a means of increasing sales, and as expressly contemplated by the Agreement, Wella would occasionally run incentive/rebate programs, whereby distributors (such as Parker) would give discounts to salon customers who purchased large volumes of Wella products, and Wella would provide a rebate to the distributors to offset the cost of the discounts. These programs were known as the "market leader" and "alliance incentive" programs because they targeted the largest customers. To obtain the rebates, Parker had to supply Wella with the customers' names, contact information, and amount of product purchased.

In 1993, Wella had acquired a controlling interest in another company that also manufactured professional hair-care products, Sebastian. Parker claims that, for years thereafter, it relied on Wella's claims that Parker would eventually be granted the right to distribute the profitable Sebastian line. Ultimately, however, Wella did not award Parker the Sebastian contract.

3

Instead, after the Wella and Sebastian companies officially merged in 2000, they decided to use Sebastian's pre-existing, in-house sales team to distribute both Sebastian and Wella products in Central Texas. Thus, on February 1, 2001, Wella notified Parker that its Distribution Agreement would be terminated sixty days later, on April 2. Following Parker's termination, the Sebastian sales team began distributing Wella products to the customers in Parker's former market.

**Procedural History**

Parker filed suit against Wella and two of its officers, German and Crawford, in January 2002. Parker sought actual and punitive damages for Wella's (1) misappropriation of proprietary, confidential, and trade secret information; (2) misappropriation of time, labor, skill, and money; (3) unjust enrichment; (4) fraud; (5) unfair competition; (6) breach of confidential relationship; (7) breach of contract; and (8) tortious interference with existing and prospective business relations. Parker also sought a declaratory judgment that Wella's forum selection clause was invalid. The essence of Parker's claims was that Wella knew in 1997 that it would be terminating Parker as its distributor, yet purposefully obtained as much confidential information from Parker as possible to allow Wella to instantly take over the market following the 2001 termination.

Wella initially responded with a motion to dismiss, claiming that—based on the Distribution Agreement's forum selection clause—Parker was bound to litigate its claims in Virginia. Following Parker's response to the motion, the trial court conducted a hearing and, in March 2003, signed an order denying Wella's motion to dismiss. Thereafter, Parker and Wella proceeded with discovery and other matters in Travis County.

4

Then, in May 2004, Wella moved for a traditional and no-evidence summary judgment on "all claims raised by Parker," asserting six separate grounds, including that all of Parker's claims were precluded by the Distribution Agreement and, alternatively, that all of Parker's claims except for breach of contract were precluded by the fact that none of the information obtained from Parker could be classified as a "trade secret."

From May to June 2004, the parties encountered scheduling difficulties related to various depositions, which resulted in Parker filing a June 4 motion for continuance of the June 28 trial setting, claiming that Wella had purposefully delayed the depositions of key witnesses under its control. On June 10, the trial court denied the motion. That same day, Parker filed a motion for an extension of time to file its summary judgment response, reciting the same arguments as those posed in its motion for continuance, with a conditional response attached. By proceeding with the summary-judgment hearing on June 14, the court impliedly overruled Parker's request for an extension. However, the court allowed Parker to file a supplemental summary judgment response and sur-reply on June 17, and the court's order expressly stated that it had considered the parties' arguments, as well as "the motion, responses, and other papers filed in this cause, including the briefs submitted after the June 14th hearing."

The June 21, 2004 order also stated that "the court ORDERS that the Wella Defendants' motion for summary judgment is GRANTED. It is therefore ORDERED that Parker Barber & Beauty Supply, Inc. ("Parker") TAKE NOTHING on its claims against the Wella Defendants. . . . All relief requested in this cause but not expressly granted in this final judgment is denied."

5

Three weeks later, Parker filed a motion for new trial and a motion for reconsideration, both of which were opposed by Wella. In Parker's August 27 response to Wella's opposition, Parker attached 24 new documents as evidence. Wella objected to this evidence as being untimely and unauthenticated. On October 1, the court ordered that Wella's objections to the evidence were dismissed as moot because Parker's motions had been overruled by operation of law. On appeal, Parker attempts to rely on these 24 late-filed documents as evidence to support its claim that the summary judgment was improper, and Wella moves to strike these documents, as well as the portions of Parker's brief relying on them.

Additionally, Parker claims on appeal that (1) the June 21 order was not a final order because it did not expressly rule on Parker's request for a declaration that Wella's forum selection clause was invalid; (2) if the order was final, it improperly granted Wella more relief than it was entitled to receive; (3) the trial court erred in refusing to grant Parker an extension of time to respond to Wella's summary judgment motion; and (4) the trial court erred in granting summary judgment because Parker produced evidence raising a genuine issue of material fact on each of its claims. We will first address the assorted procedural and evidentiary issues raised by the parties and then turn to the merits of the summary judgment.

## ANALYSIS

**Finality of the June 21 Order**

In its first issue, Parker claims that the June 21 summary judgment order was interlocutory, rather than final, because it failed to address Parker's request for declaratory relief. Alternatively, in its third issue, Parker claims that, if the order did encompass a ruling on the

declaratory judgment, then Wella was granted more relief than it was entitled to because Wella's motion for summary judgment did not address the declaratory judgment issue.

Absent an express grant of authority, we lack subject-matter jurisdiction to consider an appeal from an interlocutory order. *See Lehmann v. Har-Con Corp.,* 39 S.W.3d 191, 195 & n.12 (Tex. 2001) (citing Tex. Civ. Prac. & Rem. Code Ann. § 51.014 (West Supp. 2005)). Thus, we must first determine whether the June 21 order from which Parker appeals was "final." In *Lehmann*, the supreme court clarified the test for determining "when a judgment rendered without a conventional trial on the merits is final for purposes of appeal." *Id*. The court concluded that

> in cases in which only one final and appealable judgment can be rendered, a judgment issued without a conventional trial is final for purposes of appeal if and only if *either it actually disposes of all claims and parties then before the court*, regardless of its language, *or it states with unmistakable clarity that it is a final judgment as to all claims and all parties*.

*Id*. at 192-93 (emphasis added). The court further held that the inclusion of a Mother Hubbard clause—a recitation that "all relief not expressly granted is denied"—provides no indication of finality in a judgment rendered without a trial on the merits. *Id*. at 192, 203-04. The court instructed that, in determining whether the judgment was intended to be final, the reviewing court should look to the record in the case: "A judgment that finally disposes of all remaining parties and claims, based on the record in the case, is final, regardless of its language." *Id*. at 200. The reviewing court should also consider the language used in the order: It is not enough that the order merely uses the word "final"; rather, the intent of finality "must be unequivocally expressed." *Id*. For example, "language that the party take nothing by his claims in the case . . . shows finality if there are no other

7

claims by other parties." *Id*. at 205. Finally, the court held that if the judgment clearly disposes of all claims and parties, yet there was not an adequate basis in the record for doing so, then the judgment may be erroneous and reversible on the ground that the defendant was granted more relief than he was entitled—but it is still a final, rather than interlocutory, judgment. *Id*. at 200 (providing example of defendant moving for summary judgment on only one of plaintiff's four claims, yet court grants summary judgment as to all four).

Here, the June 21 order was titled "Final Summary Judgment," and it expressly ordered that Parker "take nothing on its claims against the Wella Defendants," who were individually named in the preceding sentence. Because Parker was the only plaintiff, and all of the defendants were included, there were no remaining parties not addressed by this language. *See id.* at 205. The judgment also stated that "[a]ll relief requested in this cause but not expressly granted in this final judgment is denied." Although basic Mother Hubbard language cannot be relied on to demonstrate finality, *see id.* at 203-04, we note that the court again used the phrase "final judgment" in this recitation. Finally, this order was issued in response to Wella moving for summary judgment on "all claims raised by Parker." Nonetheless, Parker argues that the judgment did not actually dispose of all claims because it did not address its request for a declaratory judgment. Wella responds that, because the requested declaratory judgment was moot at the time of the summary judgment, the judgment in fact addressed all *pending* claims and was, therefore, final.

In its petition, Parker sought damages based on tort and contract causes of action, as well as relief in the form of "a declaratory judgment that the forum selection clause in the distribution agreement is invalid and that the proper forum is in Travis County, Texas." Wella filed

8

a "motion to dismiss based upon the parties' forum selection agreement," claiming that the clause was valid and enforceable, and that it bound Parker to bring its claims in Virginia. Parker responded that the forum selection clause should not be enforced and that, instead, the litigation should continue in Travis County. After a hearing, the court denied Wella's motion to dismiss. Thereafter, litigation continued in Travis County.

A declaratory judgment is available only when there is a justiciable controversy between the parties. *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163-64 (Tex. 2004). That is, the Declaratory Judgment Act does not empower a court to render an advisory opinion or to rule on a hypothetical fact situation. *Id*. at 164. There are two prerequisites for a declaratory judgment action: (1) there must be a real controversy between the parties and (2) the controversy must be one that will actually be determined by the judicial declaration sought. *Houston Chronicle Publ'g Co. v. Thomas*, 196 S.W.3d 396, 401 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing Tex. Civ. Prac. & Rem. Code Ann. § 37.008 (West 1997)); *Stein v. First Nat'l Bank of Bastrop*, 950 S.W.2d 172, 174 (Tex. App.—Austin 1997, no writ).

Here, there was no need for the trial court to declare that the forum selection clause was invalid because, by denying Wella's motion to dismiss based on the clause, Parker obtained the relief it requested: the ability to litigate in Travis County. *See Houston Chronicle*, 196 S.W.3d at 401 (plaintiffs' request that court declare their legal entitlement to autopsy report became moot when plaintiffs received copy of report). Thus, there was no longer a live controversy between Parker and

9

Wella concerning the proper forum for litigation.[2]  Following the denial of Wella's motion to dismiss, a declaration that the forum selection clause was invalid—*i.e.*, that Parker was not bound by the clause to litigate in Virginia and could, instead, maintain its suit in Travis County—would have had no practical legal effect because the case had already been maintained in Travis County. *See id*.  Thus, considering both the language of the judgment and the record in this case, the June 21 order was final because it "dispose[d] of all remaining parties and claims" that were pending at the time. *See Lehmann*, 39 S.W.3d at 192.  Parker's first issue is overruled.

Furthermore, because Parker's request for declaratory relief had become moot, it was unnecessary for Wella to specifically address the claim in its summary judgment motion. Accordingly, the court's final summary judgment order did not provide Wella with more relief than it was entitled. *See id.* at 200.  Parker's third issue is overruled.

---

[2]  As a basis for arguing that a live controversy remained on this issue, Parker points to the fact that the order denying Wella's motion to dismiss did not address the attorney's fees sought by Parker in connection with the declaratory relief.  Parker, however, was the party responsible for drafting the order and, thus, for failing to include language awarding attorney's fees.  And Parker never again raised the issue of attorney's fees in connection with its mooted request for declaratory relief until after the final order was entered.  At that point, Parker brought the issue to the court's attention in one sentence contained in its motions for new trial and for reconsideration.  The trial court allowed each of these to be overruled by operation of law, thereby affirming its intent that the June 21 order be treated as a final order.  In any event, when the underlying controversy became moot, there was no longer a need for a declaratory judgment; because a declaratory judgment may not be used solely as a vehicle to obtain attorney's fees and is inappropriate if it will serve no useful purpose, Parker had no right to an award of attorney's fees under the Declaratory Judgment Act. *See Texas State Bd. of Plumbing Exam'rs v. Associated Plumbing-Heating-Cooling Contractors of Tex., Inc.*, 31 S.W.3d 750, 753 (Tex. App.—Austin 2000, pet. dism'd by agr.)

**Motion for Extension of Time**

Parker claims in its second issue that the trial court erred by failing to grant Parker an extension of time to conduct additional depositions before responding to Wella's summary judgment motion. Wella responds that the trial court did not abuse its discretion because Parker was responsible for the delay.

Texas Rule of Civil Procedure 5 allows a party to seek an extension of time to act, including filing a response to a summary judgment motion, either before or after the deadline has passed. Tex. R. Civ. P. 5. If the request for extension is made prior to the deadline, the court has discretion to grant it with or without notice or a motion, as long as there is "cause shown." *Id*. However, if the request for extension is not made until after the deadline, then the party must file a motion and demonstrate "good cause" for its failure to act within the deadline. *Id*. Because the ability to grant or deny the extension is a matter committed to the trial court's discretion, we review its decision for an abuse of discretion and we may not substitute our judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). The trial court does not abuse its discretion if some evidence reasonably supports its decision. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

The deadline for filing a summary judgment response is seven days before the hearing. Tex. R. Civ. P. 166a(c). Here, the summary judgment hearing was set for June 14, meaning that Parker's response was due on Monday, June 7, 2004. Parker, however, missed this deadline and did not file its motion for an extension of time until June 10. Thus, Parker was required to show "good cause" for its failure to timely act. *See id.* 5.

11

Under a similar factual scenario, the supreme court held that a party can demonstrate good cause for its failure to timely file a summary judgment response "by showing that (1) the failure to respond was not intentional or the result of conscious indifference, but the result of accident or mistake, and (2) allowing the late response will occasion no undue delay or otherwise injure the party seeking summary judgment." *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 688 (Tex. 2002) (regarding motion for leave to file late summary judgment response, "counsel's bare assertion that he had 'miscalendared' the summary-judgment hearing" was not good cause).

Here, Parker asserted that it was unable to timely file a response because Wella had "repeatedly delayed depositions of key witnesses." Specifically, Parker claimed that Terry Webb, Andrew Biazis, and Scott Cox were former Wella officers under Wella's control, and that Wella's "tactics" had prevented Parker from deposing the witnesses in time to incorporate their testimony into its response.[3] Parker, therefore, sought to extend its response deadline to provide enough time to complete these three depositions and use the testimony as evidence in opposition to summary judgment.

The record demonstrates that, as of September 2003, Parker was aware that Webb and Biazis were witnesses with relevant knowledge and that the trial date had been set for July 28, 2004. Yet, Parker waited until the last week of April 2004 and the beginning of May 2004 to attempt to schedule Webb's and Biazis's depositions.[4] Thereafter, the record reflects that Parker—who was

---

[3] Cox was actually a former officer of Sebastian, not Wella.

[4] In July 2003, Parker had initially noticed its intent to depose Webb. Yet, Parker voluntarily withdrew this notice in August 2003 pursuant to a Rule 11 Agreement entered by the parties and did not take further action on scheduling Webb's deposition until April 29, 2004.

attempting to depose five of Wella's witnesses during the first week of June[5]—was responsible for several of the scheduling difficulties because Parker repeatedly rescheduled, provided short notice, and failed to consult with opposing counsel about their availability for depositions. For example, in a May 14 letter, which was produced by Parker as an exhibit to support its request for an extension, Wella wrote to Parker that,

> Unfortunately, in view of the history of this case, we cannot agree to a simple rescheduling. Indeed, the thrust of Wella's pending motion to compel is that agreements between the parties on scheduling are simply not enough to protect Wella. That said, your proposal does not take into account that Wella employees have repeatedly held open dates for depositions, rearranged their schedules, and prepared for depositions, only to have to do it again (and again). Wella has been forced to expend attorneys' fees in filing motions to compel and opposing motions to quash, and your firm reneged on previously agreed dates.

Additionally, as demonstrated by another letter attached to Parker's extension request, on May 26, in response to Parker's letter that Webb's deposition would take place on June 3-4, Wella wrote,

> In view of our present schedule [of Parker also deposing three other Wella witnesses in Los Angeles on June 3-4], it would likely be impossible to fit the deposition in that week. Further . . . [Mr. Webb] indicated that, while he would be in Los Angeles part of that week, he does not have sufficient time for deposition preparation and deposition. . . .
>
> On a similar note, your recent letters indicate there are many witnesses you still want to depose, including third-parties Terry Webb, Andy Biazis, and others. We do not understand how you plan to take all these depositions in the few weeks before trial. . . . [If you plan to continue with the July 28 trial setting], we will oppose going forward with these third party depositions in the month before trial, other than those [three] listed above, which have been scheduled by agreement and/or court order.

---

[5] Parker sought the depositions of each of the following Wella witnesses at that time: Terry Webb, Andrew Biazis, Scott Cox, Theresa Wheeler, and Thomas Habrock.

13

Webb's and Biazis's depositions were ultimately scheduled for June 8 and June 22, respectively.

Based on this record, it does not appear that Wella was responsible for delaying the Webb and Biazis depositions. Based on this evidence, which was presented to the trial court in connection with Parker's request for an extension, Parker demonstrated no "good cause" for its failure to act on these depositions from September 2003 (when Parker was aware of both these witnesses' relevance as well as the July 2004 trial setting) until April-May 2004. Thus, we cannot say that the trial court abused its discretion in finding that Parker lacked good cause for the delay associated with the Webb and Biazis depositions and, therefore, in refusing to grant Parker an extension of time to file its response on this basis. *See Carpenter*, 98 S.W.3d at 688.[6]

We now turn to the facts regarding Scott Cox's deposition. The first relevant event occurred in December 2003, when Brant and Carol Parker recorded a telephone conversation they had with Cox about Wella's decision to terminate Parker's Distribution Agreement. It is apparent from the transcript of the conversation that Cox was unaware it was being recorded and, in fact, stated repeatedly that the Parkers should not disclose that the conversation even occurred. Nearly a year later, on March 3, 2004, Parker noticed its intent to depose Cox. Wella moved to quash this deposition. The record does not reflect what transpired with regard to this motion, but in late May, Parker and Wella confirmed that Cox would be deposed on June 3. Two days before Cox's scheduled deposition, Parker first produced the transcript of the Cox/Parker telephone conversation. Wella immediately responded on June 2, stating,

---

[6] In connection with this issue, Parker and Wella also dispute whether a subpoena was required for Webb's deposition. Because our holding does not depend on whether or not a subpoena was required, we do not address this dispute.

Late yesterday, we received a copy of what appears to be a transcript of a December 2003 telephone conversation between Sebastian's former senior vice president Scott Cox, and Brant and Carol Parker in which they discuss the substance of this litigation. The information in this document is directly contrary to what he told Wella in advance of his deposition. . . . [Accordingly], we can no longer represent Mr. Cox for purposes of his deposition . . . [and] have advised Mr. Cox that, in view of this transcript, he should seek his own attorney. . . . [We may] seek other remedies based on (1) this ex parte contact with a former Sebastian officer, made expressly to affect Wella's potential liability, and (2) the withholding of this document, despite numerous requests for its production, until the eve of the scheduled deposition.

On June 8, the parties entered a Rule 11 Agreement that Cox's deposition would occur on June 9.

Again, based on the record before us, it does not appear that Wella was responsible for the delay. Parker does not complain about any scheduling difficulty with Cox's deposition until Wella's June 2 cancellation. Yet, Parker chose to conceal the existence of the transcript (which had been in Parker's possession for six months) until the eve of the deposition. Thus, we cannot say that the trial court abused its discretion in refusing to grant Parker an extension of time to file its summary judgment response on the basis of any delay related to Cox's deposition. *See id*.[7]

Parker's second issue is overruled.

**Motion to Strike Late-Filed Evidence**

Before turning to the merits of the summary judgment, we must determine what evidence was properly before the trial court for consideration in connection with the motion. Thus, as an initial matter, we consider (1) Wella's motion in this Court to strike 24 exhibits that were filed

---

[7] Moreover, even though the court permitted Parker to supplement its response with additional evidence on June 17 (more than a week after Webb's and Cox's depositions had been taken), Parker chose not to include any testimony from these depositions in its supplement.

15

by Parker for the first time in connection with its motion for new trial/motion for reconsideration, as well as the portions of Parker's brief relying on those exhibits, and (2) Parker's response to that motion.

It is well established that in considering a motion for summary judgment, the trial court shall consider only the evidence that is on file at the time of the hearing or that is filed with permission of the court after the hearing but before the judgment is signed. Tex. R. Civ. P. 166a(c); *Valores Corporativos, S.A. de C.V. v. McLane Co.*, 945 S.W.2d 160, 162 (Tex. App.—San Antonio 1997, writ denied). To consider late-filed evidence, the record must affirmatively demonstrate that the evidence was filed with leave of court or that the court otherwise accepted or considered it. *See Benchmark Bank v. Crowder*, 919 S.W.2d 657, 663 (Tex. 1996) (affidavit that was filed late and without leave of court could not be considered for summary judgment purposes); *Stephens v. Dolcefino*, 126 S.W.3d 120, 133-34 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (record affirmatively indicated court's consideration of evidence based on oral ruling in transcript that "the court will include the evidence offered today in the summary judgment record"); *Lection v. Dyll*, 65 S.W.3d 696, 702 (Tex. App.—Dallas 2001, pet. denied) (new evidence attached to motion for reconsideration and/or new trial following summary judgment cannot be considered without leave of court).

Texas law does not allow parties to create fact issues in a motion for new trial or reconsideration that should have been raised in response to a motion for summary judgment. *Denman v. Citgo Pipeline Co.*, 123 S.W.3d 728, 734 (Tex. App.—Texarkana 2003, no pet.) (appellate court could not consider evidence that was attached to motion for reconsideration of

16

summary judgment order, which had not been previously filed, because there was no indication in record that trial court had considered it); *Risner v. McDonald's Corp*., 18 S.W.3d 903, 909 (Tex. App.—Beaumont 2000, pet. denied) (party may not present additional evidence in a motion for new trial unless such evidence is newly discovered); *Priesmeyer v. Pacific Sw. Bank, F.S.B*., 917 S.W.2d 937, 939 (Tex. App.—Austin 1996, no writ) (evidence attached for first time to motion for new trial was not proper summary judgment evidence).

Here, following the court's June 21 final order, Parker moved for a new trial and/or reconsideration of the summary judgment on July 16. The two motions were filed on the same day and contained practically identical language. Accordingly, Wella filed a "combined opposition" to these motions. On August 27, Parker filed a reply to Wella's combined opposition, attaching for the first time 24 new exhibits. Wella objected to the consideration of this newly filed evidence, and Parker sought leave of court for its consideration.

Nothing in the record reflects that the court granted Parker's request for leave. Instead, the record contains a written order stating that, "because [Parker's] motion for new trial has been overruled by operation of law, [Wella's] objections are overruled as moot." From this we infer that the trial court denied Parker's request for leave and did not consider the newly filed evidence. On appeal, Parker again attempts to rely on these 24 exhibits as support for its claim that at least a scintilla of evidence exists to prevent summary judgment on each of its claims. Wella urges this Court to strike the late-filed exhibits and the portions of Parker's brief relying on them.

We agree with Wella that these 24 exhibits were not properly before the trial court for its consideration in connection with the summary judgment because they had not been filed prior

17

to the signing of the judgment, leave was not granted for their filing, there is no affirmative indication in the record that the court considered the evidence,[8] and Parker made no claim that the evidence was newly discovered or gave any other reason for its late filing. *See* Tex. R. Civ. P. 166a(c); *Benchmark*, 919 S.W.2d at 663; *Stephens*, 126 S.W.3d at 133-34; *Lection*, 65 S.W.3d at 702; *Risner*, 18 S.W.3d at 909; *Priesmeyer*, 917 S.W.2d at 939. Therefore, we grant Wella's motion to strike and do not consider these 24 exhibits or the specific portions of Parker's brief discussing them. *See Denman*, 123 S.W.3d at 734; *Crossley v. Staley*, 988 S.W.2d 791, 794 (Tex. App.—Amarillo 1999, no pet.) (granting motion "to strike documents outside the record contained in the appendix to the brief of [appellants], and references in their brief to such documents").[9]

---

[8] Parker claims that a letter sent from the court to the parties demonstrates that the court considered the late-filed evidence. The letter, however, does not appear in the record. Instead, it is attached to Parker's response to Wella's motion to strike. Documents attached as appendices to appellate briefs are not formally included in the record on appeal and, therefore, will not be considered on appeal. *Cantu v. Horany*, 195 S.W.3d 867, 870 (Tex. App.—Dallas 2006, no pet.); *Nguyen v. Intertex, Inc.*, 93 S.W.3d 288, 293 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Furthermore, Parker's response is not verified. *See* Tex. R. App. P. 10.2(a) (motion that depends on facts not in record must be verified).

[9] Parker urges that, if anything, only the late-filed evidence, and not the related portions of its brief should be struck. As to not deprive Parker of any equity in our review, we consider every portion of its brief except for those directly discussing the evidence in the stricken exhibits. *See Carlisle v. Philip Morris*, 805 S.W.2d 498, 501 (Tex. App.—Austin 1992, writ denied) (in addition to striking evidence outside the record, court refused to consider "offending portion of [appellants'] brief" that relied on such evidence). Stated another way, the portions of its brief relying solely on the stricken exhibits are without merit because there is no evidence in the record to support them. *See* Tex. R. App. P. 38.1(h) (argument must be supported with appropriate citations to record); *McMahan v. Greenwood*, 108 S.W.3d 467, 483 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (because late-filed evidence could not be considered, "there [was] no evidence in the summary judgment record to raise a fact issue").

18

**Transcript of Parker/Cox Conversation**

The parties also dispute whether the transcript of the telephone conversation recorded between the Parkers and Scott Cox can be properly considered as summary judgment evidence. As with the motion to strike, we must decide this issue before turning to the merits of the summary judgment. The transcript was filed with the court as an exhibit to Parker's conditional summary judgment response. Wella did not object on the basis of timeliness or authentication of the evidence. Rather, Wella objected in writing to the trial court's consideration of this evidence on the grounds that the transcript (1) was not the best evidence of the recorded conversation, *see* Tex. R. Evid. 1001-02; (2) was hearsay with respect to Cox's statements, *see id.* 801; (3) was "speculation within hearsay" because Cox discussed his assumptions about actions taken by other parties; (4) was not an admission of a party opponent so as to protect it from the hearsay objection, *see id.* 801(e)(2), because Cox worked for Sebastian, not Wella; (5) was incomplete, given the notation at the top of the transcript that the conversation ensued after completing a discussion of other matters; and (6) was fraudulently obtained because Parker did not inform Cox that he was recording the conversation for use in the lawsuit. The record contains no evidence of a ruling on any of these objections, and Wella does not claim to have obtained a ruling on any of its objections.

We conclude that the transcript may properly be considered as part of the summary judgment evidence because each of Wella's objections were to the *form* of the evidence (rather than to its *substance*), and the record reflects no ruling on any of these objections. *See Giese v. NCNB Tex. Forney Banking Ctr.*, 881 S.W.2d 776, 782 (Tex. App.—Dallas 1994, no writ) (to preserve error on objection to form of summary judgment evidence, objection must be presented to trial court in

19

writing, and record must reflect ruling on objection); *see also Aust v. Conroe Indep. Sch. Dist.*, 153

S.W.3d 222, 227 n.2 (Tex. App.—Beaumont 2004, no pet.) (unofficial transcript of recorded

telephone conversation was properly considered as summary judgment evidence because record

contained no evidence that trial court ruled on any of defendant's objections to transcript); *Rizkallah*

*v. Conner*, 952 S.W.2d 580, 589 n.7 (Tex. App.—Houston [1st Dist.] 1997, no pet.) (hearsay

objection is to form); *Rodriguez v. Ed Hicks Imports*, 767 S.W.2d 187, 190 (Tex. App.—Corpus

Christi 1989, no writ) ("not best evidence" objection is to form)[10]; *cf. Dodge v. Durdin*, 187 S.W.3d

523, 532 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (no objection or ruling is necessary to

preserve error on objection to evidence's substantive defect).[11]

**Choice of Law**

        A final matter that we must decide before turning to the merits of the summary

judgment is what law should govern Parker's claims. The 1996 Distribution Agreement included

---

[10] Although our research revealed no case discussing whether objections to summary judgment evidence as "incomplete" or "fraudulently obtained" are to its form or substance, we conclude that they are objections to form because they do not create a deficiency in the actual, substantive claim of the party, such as an objection to the conclusory nature of an affidavit or to the non-existence of proof. *See Dodge v. Durdin*, 187 S.W.3d 523, 532 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (conclusory statements in affidavit present substantive defect); *Galindo v. Dean*, 69 S.W.3d 623, 627 (Tex. App.—Eastland 2002, no pet.) (reliance on facts contained only in missing exhibit is substantive defect).

[11] In any event, having reviewed the transcript in full, we find its primary content to provide evidence that Wella intended to terminate Parker as early as 1997, which is contrary to Wella's claim that the decision was not made until 2001. However, Cox makes no statement in the transcript that provides evidence of Wella obtaining or misusing Parker's trade secrets—the basis on which our resolution of the summary judgment turns. Thus, even taking all statements in the transcript as true, it does not affect our holding.

a choice-of-law provision stating that "[t]his Agreement shall be construed in accordance with the laws of the state of New York, without regard to its conflict of laws provisions." Although both parties presented argument to the trial court concerning the choice-of-law issue, the record does not reflect a ruling by the trial court as to whether New York or Texas law should apply.

Interpreting a similar choice-of-law provision, the supreme court held that

> [t]his provision, by its terms, applies only to the interpretation and enforcement of the contractual agreement. It does not purport to encompass all disputes between the parties or to encompass tort claims. The claims that [plaintiff] asserts arise under Texas tort law. [Plaintiff's] claims do not rise or fall on the "interpretation and enforcement" of any contractual provision.

*Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 433 (Tex. 1999); *see also Red Roof Inns, Inc. v. Murat Holdings, L.L.C.*, No. 05-05-00240-CV, 2006 Tex. App. LEXIS 7576, at *13 (Tex. App.—Dallas Aug. 25, 2006, no pet. h.) (opinion) ("A choice of law provision in a contract that applies only to the interpretation and enforcement of the contract does not govern tort claims."). As in *Stier* and *Red Roof Inns*, the choice-of-law provision here relates only to a construction of the contractual terms. Furthermore, the parties do not dispute that the state with the "most significant relationship" to Parker's claims is Texas. *See Red Roof Inns*, 2006 Tex. App. LEXIS 7576, at *14 (law governing substantive claims determined by "most significant relationship" test) (citing Restatement (Second) of Conflict of Laws §§ 6, 145 (1971)). Thus, we conclude that any necessary interpretation of the Agreement should be performed using New York law, but the merit of Parker's claims should be analyzed under Texas law.

Having resolved each of the parties' procedural and evidentiary issues, we now turn to the merits of the summary judgment to determine whether the trial court was correct in concluding that no genuine issue of material fact remained on any of Parker's pending claims.

**Summary Judgment**

After the declaratory judgment issue became moot, Parker's pending claims alleged that Wella was liable for (1) misappropriation of proprietary, confidential, and trade secret information; (2) misappropriation of time, labor, skill, and money; (3) unjust enrichment; (4) fraud; (5) unfair competition; (6) breach of confidential relationship; (7) tortious interference with existing and prospective business relations; and (8) breach of contract. Wella moved for both traditional and no-evidence summary judgment, claiming that no genuine issue of material fact remained on any of Parker's claims because (1) the 1996 Distribution Agreement precludes all claims; (2) none of the information provided by Parker to Wella can be considered "proprietary," "confidential," or "trade secrets"; (3) Parker's fraud claim fails as a matter of law because Parker admittedly did not rely on Wella's statements and the statements were of future intent, not present fact; (4) Wella had no duty to refrain from selling to former customers of Parker; (5) there is no evidence on at least one element of each of Parker's claims; and (6) there is no evidence of damages for any of Parker's claims. The trial court granted summary judgment against Parker on all claims without stating any grounds. Parker complains in its fourth issue that the trial court erred in granting summary judgment because Parker produced more than a scintilla of evidence to support each element of each of its claims.

22

*Standard of Review*

A no-evidence motion for summary judgment must be granted if, after an adequate time for discovery, (1) the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial, and (2) the nonmovant fails to produce more than a scintilla of summary judgment evidence raising a genuine issue of material fact on those elements. Tex. R. Civ. P. 166a(i). In reviewing a no-evidence summary judgment, we "must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion" to determine whether more than a scintilla of evidence was presented on the challenged elements of the nonmovant's claim. *City of Keller v. Wilson*, 168 S.W.3d 802, 825 (Tex. 2005); *Perdue v. Patten Corp.*, 142 S.W.3d 596, 604 (Tex. App.—Austin 2004, no pet.).

In a traditional summary judgment, the movant carries the burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). To be entitled to traditional summary judgment, a defendant must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

In a case where the trial court's judgment does not specify the grounds relied upon for its ruling, as here, the summary judgment must be affirmed if any of the theories advanced in the motion is meritorious. *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005); *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 692 (Tex. App.—Austin 2005, pet. denied). Because the propriety

23

of a summary judgment is a question of law, we review the trial court's decision de novo. *See*

*Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994). We will consider the merits of Wella's

various grounds to determine whether any of Parker's claims should have survived the summary

judgment.[12]

***Distribution Agreement***

According to Wella, the 1996 Distribution Agreement precludes all of Parker's

claims. Wella argues that it cannot be liable for terminating Parker as a distributor and replacing

Parker with Sebastian's in-house sales team because the Agreement expressly provided Wella with

the right to do so. The Agreement unambiguously stated that each party could "terminate or elect

not to renew the Agreement, without cause, upon sixty (60) days written notice." Wella complied

with this by giving Parker notice on February 1, sixty days prior to the April 2 termination. The

Agreement also provided in paragraph 20 that,

> [i]n the event of nonrenewal or termination of this Agreement, Wella reserves the
> right to appoint one or more additional distributors of Wella Products with whole or
> partial responsibility for the territory set forth in Schedule A on or after the date on
> which notice of nonrenewal or termination may be given, as Wella, in its sole
> discretion, may determine.

---

[12] As an initial matter, Wella asserts on appeal that an independent ground for affirming the
summary judgment is that, while Wella's motion was submitted on behalf of all three defendants
(Wella, German, and Crawford), Parker's response only addressed Wella. We disagree. The first
page of Parker's response expressly stated that, thereafter, it would refer to all three defendants
collectively as "Wella." This was sufficient for Parker's response to cover its claims against all
defendants, especially in light of the fact that Wella itself referred to all defendants collectively as
"Wella" in many of its pleadings.

24

This language gave Wella the right to replace Parker with Sebastian as its distributor for the 65 Central Texas counties in Parker's former market. Thus, based on the Distribution Agreement, Wella could not be held liable for terminating Parker and switching its Central Texas distribution efforts to Sebastian.

This, however, does not cover the extent of Parker's claims against Wella: Parker recognizes that Wella had the right to terminate Parker as its distributor and, instead, use Sebastian. What Parker complains about is Wella's alleged misuse of Parker's confidential and trade secret information in the process. More specifically, Parker claims that Wella fraudulently induced Parker to provide Wella with its confidential customer information for several years during which Wella knew that Parker would be terminated, yet lied to Parker about the future of their relationship, promising Parker that it would be rewarded with the Sebastian contract. In addition to fraud, Parker claims that this constituted misappropriation of its confidential information, as well as the time and money Parker had invested in building the Wella name and increasing sales for Wella. Parker alleges that, after the termination, Wella misused this "stolen" information by providing it to Sebastian, so that it would have an "instant business" in the Central Texas market of Wella customers. According to Parker, this resulted in Wella being unjustly enriched and constituted unfair competition and tortious interference with existing and prospective business relations. Further, Parker urges that Wella had a duty of confidence to not steal and misuse its trade secret information and that Wella breached that duty.

Again, Wella responds that each of Parker's claims are precluded by the Agreement, but focuses here on paragraph 21 of the Agreement, which Wella claims constitutes a full release of liability. Paragraph 21 stated that

> Wella's exercise of its rights under paragraphs 19 and 20 shall not create any obligation or indebtedness of any kind to Distributor, including without limitation any claim against Wella for profits or other revenue, charges or damages attributable to such sales, other than commissions or other compensation expressly due to Distributor under applicable Wella programs.

As set forth previously, paragraph 20 provided Wella the right to replace Parker with another distributor in the Central Texas territory and have the new distributor target and sell to the exact same customers that Parker formerly sold to, as long as the sixty-day notice provision was adhered to.[13] Nevertheless, paragraph 20 did not provide Wella the right to obtain confidential information from Parker and then unfairly use it in competition with Parker.

Thus, while the plain language of paragraph 21 excuses Parker from any liability based on its decision to terminate Parker and replace it with another distributor in the same area, paragraph 21 cannot be construed as a general release of liability for all tort claims arising outside of the contract. Accordingly, in the event that Parker's evidence was sufficient to create a fact question about its tort claims, paragraph 21 does not affirmativly negate Wella's potential liability on such claims. *See Rubycz-Boyar v. Mondragon*, 790 N.Y.S.2d 266, 267-68 (N.Y. App. Div. 2005) (release "will not bar subsequent claims unless they are specifically embraced within the release or

---

[13] Paragraph 19, which is not relevant to the issues here, discussed the parties' rights to sell to hair-styling schools. Accordingly, we will discuss paragraph 21 only in the context of paragraph 20, without regard to paragraph 19.

fall within the fair import of its terms"); *Alcantara v. 603-607 Realty Assocs.*, 710 N.Y.S.2d 99, 99 (N.Y. App. Div. 2000) ("release may not be read to cover matters which the parties did not desire or intend to dispose of").

Therefore, Wella's claim that the Distribution Agreement precludes all of Parker's claims was not an appropriate ground on which summary judgment could have been granted. Having resolved the contract interpretation issue pursuant to New York law, we now turn to an analysis of Parker's tort claims under Texas law. *See Stier*, 992 S.W.2d at 433.

### *Provision of Trade Secrets or Confidential, Proprietary Information*

Wella asserts that there is no evidence that Parker provided, or that Wella otherwise obtained or misused, any of Parker's information that could be defined as a "trade secret" or as confidential, proprietary information.[14]  Wella claims that this lack of evidence provided a proper ground for the trial court to grant summary judgment on each of Parker's claims for which the provision of such information is a necessary element: misappropriation of proprietary, confidential, and trade secret information; unjust enrichment; fraud; unfair competition/misappropriation of time, skill, and money; breach of confidential relationship; and tortious interference with existing and prospective business relations—*i.e.*, all of Parker's claims except for breach of contract. *See* Tex. R. Civ. P. 166a(I).

---

[14] The parties alternatively used each of these terms at various times.  For ease, we will refer to such information simply as "trade secrets."

Although Parker pled these claims as seven separate causes of action, they all fall under the umbrella of "unfair competition" regarding the misappropriation of trade secrets.[15] Under Texas law, a plaintiff can recover for misappropriation of a trade secret by establishing that (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or was discovered by improper means, (3) the defendant used the trade secret without the plaintiff's authorization, and (4) the plaintiff suffered damages as a result.[16] *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 197 (Tex. App.—Fort Worth 2005, no pet.); *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied).

The second element of misappropriation focuses on the improper acquisition of the trade secret, which can be the basis of a fraud cause of action if the plaintiff establishes that the defendant employed fraudulent means to obtain the information. *See* Restatement (Third) of Unfair Competition § 43 (1995). Parker asserted that Wella fraudulently induced it to provide its confidential information by misrepresenting to Parker that its information would not be used for any

[15] *See* James E. Hudson, III, *A Survey of the Texas Unfair-Competition Tort of Common-Law Misappropriation*, 50 Baylor L. Rev. 921, 923 (1998) ("unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters. [Independent causes of action exist] within the broad scope of unfair competition."); *see also* Restatement (Third) of Unfair Competition § 40 cmt. a (1995) ("however denominated," unfair competition includes torts for misappropriation, infringement, unjust enrichment, and breach of confidence, but *not* breach of contract).

[16] Unlike this common-law test, which requires proof of both the second and third elements, the Restatement (Third) of Unfair Competition states that "improper acquisition" and "improper use or disclosure" of the trade secret are independently actionable torts. *See id.* § 40 & cmt. b-c, § 43 (1995). It is not clear, however, if Texas expressly follows this Restatement. Although in 2003, the supreme court acknowledged and agreed with portions of the Restatement (Third) of Unfair Competition, it nevertheless used the six-factor test set forth in the Restatement of Torts § 757 cmt. b (1939) to define a trade secret. *See In re Bass*, 113 S.W.3d 735, 739-42 (Tex. 2003).

improper purpose and by falsely promising Parker that it would ultimately be rewarded with the coveted Sebastian contract while, in reality, Wella intended to terminate Parker and replace it with Sebastian's distribution team.

The third element of misappropriation focuses on the defendant's misuse of the trade secret. Establishing that the defendant improperly used or disclosed the information can give rise to causes of action for unfair competition[17] and tortious interference with contractual relationships. Also, if it is established that the defendant owed the plaintiff a duty of confidence, then the defendant's misuse of the trade secret may result in liability for breach of a confidential relationship.[18] Finally, if the plaintiff can establish that the defendant unfairly benefitted from its

---

[17] Specifically, the elements of this cause of action have been defined as (1) the creation of plaintiff's product (*i.e.*, the trade secret information) through extensive time, labor, skill, and money; (2) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (*i.e.*, a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) commercial damage to the plaintiff. *Synercom Tech., Inc. v. University Computing Co.*, 474 F. Supp. 37, 39 (N.D. Tex. 1979); *United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App.—Waco 1993, writ denied). Because Parker's claim for "misappropriation of time, labor, skill, and money" is encompassed within this definition, if summary judgment was proper on its "unfair competition" claim, then it was also proper on this claim. In any event, we find no basis to reverse the court's grant of summary judgment as to Parker's claim for "misappropriation of time, labor, skill, and money" because Parker failed to address this claim in either its original or reply briefs to this Court. *See* Tex. R. App. P. 38.1 (brief must contain clear and concise argument for contentions made).

[18] The Restatement (Third) of Unfair Competition § 41 states that a "duty of confidence" exists when "(a) the person made an express promise of confidentiality prior to the disclosure of the trade secret; or (b) the trade secret was disclosed to the person under circumstances in which the relationship between the parties to the disclosure or the other facts surrounding the disclosure justify the conclusions that, at the time of the disclosure, (1) the person knew or had reason to know that the disclosure was intended to be in confidence, and (2) the other party to the disclosure was reasonable in inferring that the person consented to an obligation of confidentiality." Although Wella asserted as an additional ground for summary judgment that it owed no such duty, we assume without deciding that a duty of confidentiality existed and ask, even if Wella owed such a duty, was there any evidence in the record that Wella misappropriated Parker's trade secret information?

improper acquisition or misuse of the trade secret, then the plaintiff may be able to recover for unjust enrichment. Parker claimed that, following its termination, Wella used the improperly acquired confidential information in direct competition with Parker by providing it to the Sebastian distributors. According to Parker, this also constituted tortious interference with the existing and prospective sales contracts Parker had or would have with its customers. Parker claimed that Wella's misuse of its confidential information breached Wella's duty of confidence and, as a result, unjustly enriched Wella.

Nonetheless, regarding all of these causes of action, the plaintiff's initial burden is to demonstrate the existence of a trade secret. Although Wella sought both a traditional and no-evidence summary judgment, we will first review the merits of the summary judgment under the no-evidence standards. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). Thus—looking at the evidence that was properly before the court for consideration in connection with the summary judgment—if the record here fails to demonstrate any evidence that trade secret information was provided by Parker and/or improperly obtained or misused by Wella, then we must affirm the trial court's grant of summary judgment on each of the seven claims listed above. Parker claimed that the trade secrets misappropriated by Wella consisted of its customer lists and customer information.

"A trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a . . . list of customers. . . . It may [] relate to the sale of goods [such as] . . . a list of specialized customers." Restatement of Tort § 757

30

(1939).[19]  "The subject of a trade secret must be secret."  *Id*.  If the information is generally known or readily ascertainable through independent investigation, then it is not protectable as a trade secret. *Trilogy Software*, 143 S.W.3d at 467.  Still, the trade secret protection remains intact if ascertaining the information would be difficult, costly, or time-consuming.  Restatement (Third) of Unfair Competition § 39 cmt. f.

To determine whether information should be classified as a trade secret, we weigh six factors in the context of the surrounding circumstances:  (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of the measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  *In re Bass*, 113 S.W.3d 735, 739-40 (Tex. 2003) (quoting Restatement of Torts § 757 cmt. b).

---

[19]  Texas courts continue to follow the definition of trade secrets, as well as the six factors used to identify a trade secret, set forth in section 757 of the original Restatement of Torts, despite the facts that this section was omitted from the Restatement (Second) of Torts, that the Restatement (Third) of Unfair Competition provides a slightly altered definition of trade secrets, and that many states—not including Texas—have adopted the Uniform Trade Secrets Act.  *See In re Bass*, 113 S.W.3d at 739-42 (discussing history and concluding that section 757 remains instructive in Texas); *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied) (applying section 757); *American Derringer Corp. v. Bond*, 924 S.W.2d 773, 776 n.1 (Tex. App.—Waco 1996, no writ) (even after adoption of Restatement (Third) of Unfair Competition, "Texas courts have generally followed the principles of the original Restatement"); *Milgrim on Trade Secrets* §§ 1.01[2], 1.02 (1997) (section 757 "continues to have vitality and interpretive force" as the "uniformly recognized trade-secret definition").

Whether a customer list should be considered a trade secret depends on the circumstances:

> [I]f the potential customers for a particular product or service are readily identifiable, their identities do not constitute a trade secret. On the other hand, specialized customer information that cannot easily be duplicated . . . or a compilation of specific information about individual customers, may be sufficiently valuable and secret to qualify as a trade secret.

Restatement (Third) of Unfair Competition § 42 cmt. f. However, "this does not mean that trade secret status automatically attaches to any information that a company acquires regarding its customers; if it did, it would amount to a de facto common law non-compete prohibition." *Trilogy Software*, 143 S.W.3d at 466-67; *see also Crouch v. Swing Machinery Co.*, 468 S.W.2d 604, 606 (Tex. App.—San Antonio 1971, no writ) (recognizing that "customer list cases stand on the periphery of that area of the law which can best be described as 'the trade secret quagmire'"). Generally, if the information is a list of wholesale customers that is not contractually protected by a restrictive covenant, then trade secret status does not attach because former salespeople should not be prevented from using their skills to sell a particular type of product to a particular market and because "courts are sensitive to the relative ease of identifying potential customers at the wholesale user level," such as through trade journals and phone books. *Milgrim on Trade Secrets* § 1.09[7] (1997).

Here, Parker admits that Wella did not misappropriate its entire customer list and that Wella did not physically steal any customer information from Parker's records. Rather, as testified to by Brant Parker, Parker asserts that Wella obtained "byproducts" of its customer information

through the rebate forms Parker provided to Wella in connection with the "market leader" and "alliance incentive" programs run by Wella. Brant testified that Parker provided such information for 39 of its most profitable customers through these rebate forms. John Fortunado, Wella's vice president of direct sales, testified that it was "standard operating procedure" for this information to be provided in order to justify the amount of the rebate.

Although Parker claims that "detailed" customer information was provided to Wella, the rebate forms submitted as summary judgment evidence reveal that Parker supplied only the customers' names, addresses, phone numbers, contact people, customer code numbers, and amounts of the exchanges. Wella put forth evidence that such information is readily available in the marketplace by looking in the phone book, walking into salons to see if Wella products are on the shelves, and/or contacting the cosmetology licencing board. Eddie Morrison, who works for the technology department of the Texas Cosmetology Commission (TCC), averred that TCC maintains lists of all Texas-licensed cosmetologists, salons, and schools, and will provide lists of these entities' basic information to anyone for a fee. Parker responded that the information it maintains about its customers is far more detailed and valuable than the lists that are publically available from the TCC. Even assuming this is true, however, Parker failed to produce any evidence to show that it provided or that Wella otherwise obtained such detailed information from Parker. Rather, the record demonstrates that Parker provided Wella only basic information about its customers—including their contact information and very limited sales information regarding the rebate purchase.[20]

---

[20] Beyond the actual rebate forms, Wella officer Thomas Habrock testified that he was unaware of Parker ever providing Wella information about its customers' buying habits or its

33

Further, Brant acknowledged that Parker submitted this information about a very small percentage of its customers. While it is undisputed that Parker sold Wella products to approximately 1,400 customers in the Central Texas area, Brant testified that Parker repeatedly submitted this information about the same 39 customers. The evidence in the record affirms that the same 39 customers were repeatedly listed. Thus, although Brant also testified that Parker had provided "hundreds of lists of customers," it appears that the information supplied was always for the same 39 customers.[21]

Moreover, Fortunado expressly denied that Wella misused any customer information that it had obtained from Parker. First, Fortunado explained that Wella's decision to merge its distribution efforts with Sebastian's was not intended to harm Parker. Rather, it was simply the most logical option because the sales "infrastructure [was already] existing in the marketplace with the Sebastian brand"; there were already "Sebastian salesmen, . . . warehousing, offices, education center, et cetera." Fortunado also averred that, as part of the merger, Wella relocated its offices from

---

potential customers, and Wella officer Rolando Reyes testified that the only customer information he ever obtained from Parker was that provided on the rebate forms.

[21] We note that the record reflects that Parker also provided sales data to Wella in response to a 1995 request for all distributors to share such information so that Wella could produce a nationwide market report. Yet, Parker never relies on this as evidence of trade secrets provided to Wella. In any event, this information was provided in 1995—prior to the time Wella allegedly had decided to terminate Parker. Thus, in light of Parker's claim that Wella concealed its intention to terminate Parker from 1997 until 2001 in order to fraudulently induce Parker to reveal its customer information during that time, the fact that this information was provided in 1995 provides no evidence to support Parker's "fraudulent inducement" claim. Also, there is no evidence to show, and Parker does not claim, that Wella misused any of the information provided in response to the 1995 request. Rather, it appears from the record that Wella used the data only to compile regional statistics with the stated purpose of providing distributors "insight into the current trends of the beauty industry," as well as to "set forth the platform from which we will continue to increase and measure market penetration."

New Jersey to California and, as part of that move, Wella "discarded old forms including its distributor rebate forms." Finally, Fortunado testified that, after Parker's termination, when the Sebastian distributors began selling Wella products in Parker's former market, the Sebastian team did "absolutely not" have "a list of sales targets or names to go contact" and did not use any of the information that had been provided on Parker's rebate forms in order to sell Wella products in the Central Texas area.

Parker failed to controvert Fortunado's testimony. Instead, when Riley Parker was asked whether any "Sebastian salespeople [] have used any of Parker's confidential customer information," Riley responded, "I don't know." Brant Parker admitted that he had no actual knowledge of whether Wella had collected the information from Parker's rebate forms and used it to target customers and/or whether Wella had provided any of the customer information to the Sebastian sales team. Brant "believed" Wella had misused the information on the basis that, soon after the termination, Sebastian salespeople set up meetings with some of Parker's former customers. Yet, documents produced by Wella demonstrated that all but four of the customers identified by Parker were also Sebastian customers prior to the transition of distributors. And Brant agreed in his deposition that, prior to Parker's termination, Sebastian salespeople visited salons in the same territory covered by Parker for its own sales purposes.

Based on this record, we conclude that Parker failed to put forth a scintilla of evidence to demonstrate that Wella improperly obtained or misused any of its trade secret information. *See IAC, Ltd.*, 160 S.W.3d at 197. The basic customer contact and limited sales information that Parker provided about 39 of its customers is "information that is generally known

35

or readily ascertainable through independent investigation" and, thus, is not entitled to trade secret protection. *See Trilogy Software*, 143 S.W.3d at 467. The six-factor test set forth in the Restatement of Torts confirms this conclusion because the bulk of the information provided on the rebate forms about Parker's 39 professional salon and cosmetology customers—*i.e.*, their names, addresses, telephone numbers, and contact people—is easily ascertainable by those outside the business by contacting TCC or looking in the phone book, and the majority of this information is already known by competitors inside the industry. Thus, because it is relatively simple and inexpensive to acquire or duplicate this basic information, it does not carry a high value. *See In re Bass*, 113 S.W.3d at 739-40. Moreover, nothing in the Distribution Agreement addressed the confidentiality of such information; thus, the lists provided here were more akin to a "list of wholesale customers that is not protected by a restrictive covenant" than a "specialized list of customers." *See Milgrim on Trade Secrets* § 1.09[7].

In response, Parker emphasizes that it spent decades and a significant amount of money developing its customer information and its sales relationships with customers. As we have stated, we believe that this is true and that such information is the type of specialized, confidential information entitled to trade secret protection. *See* Restatement (Third) of Unfair Competition § 42 cmt. f. Nevertheless, there is no evidence that Wella improperly obtained or misused any such information.

Instead, the record reflects that the only customer information obtained by Wella was that listed on the rebate forms, and this is simply not the type of information entitled to trade secret protection. *See Milgrim on Trade Secrets* § 1.09[7]. Thus, Parker failed to put forth a scintilla of

evidence to show that Wella fraudulently induced Parker to provide trade secret information. *See* Tex. R. Civ. P. 166a(I). And even if this information was classified as trade secrets, none of the evidence properly presented for the trial court's summary judgment consideration shows that Wella misused any of the information provided on Parker's rebate forms. Accordingly, Parker failed to create a genuine issue of material fact about whether Wella misappropriated any of Parker's proprietary, confidential, or trade secret information; was unjustly enriched; unfairly competed with Parker or misappropriated Parker's time, skill, and money; breached its duty of confidence toward Parker; or tortiously interfered with any of Parker's existing or prospective contractual relationships. Thus, the lack of evidence regarding trade secrets was a proper ground for the trial court to grant summary judgment on all of Parker's claims except for breach of contract. *See id.*

### Breach of Contract

Beyond Parker's tort claims related to the misappropriation of trade secrets, the only remaining cause of action pled in Parker's original petition is breach of contract. The breach of contract alleged by Parker was not that Wella somehow breached the Distribution Agreement by terminating Parker and replacing it with Sebastian. As stated, Parker acknowledges that Wella had a right to do so as long as it complied with the sixty-day notice provision. Rather, the basis of Parker's breach of contract claim was that Wella failed to reimburse it for certain products. Parker has waived this claim by failing to address it in its conditional or supplemental responses to Wella's summary judgment motion, its appellate brief, or its reply brief, and by otherwise presenting no evidence about the allegedly owed reimbursements. *See* Tex. R. Civ. P. 166a(i); Tex. R. App. P.

37

38.1.  Thus, the trial court properly granted summary judgment in favor of Wella on Parker's breach of contract claim.

### *Summary Judgment Conclusion*

Although the Distribution Agreement did not preclude Parker from bringing its claims against Wella, Parker's tort claims fail based on the lack of evidence regarding trade secrets, and its contract claim was waived.  Accordingly, the trial court correctly granted summary judgment in favor of Wella.  Parker's fourth issue is overruled.

## CONCLUSION

Having overruled each of Parker's four issues and granted Wella's motion to strike, we affirm the trial court's final summary judgment.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear:  Opinion by Chief Justice Law; Concurring Opinion by Justice Patterson

Affirmed

Filed:  October 11, 2006